**UNITED STATES DISTRICT COURT**
**EASTERN DISCTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KIMBERLY TOOLEY, as Next Friend of
SETH TOOLEY,

       Plaintiff,

vs.                                Case No.: 14-cv-13466-ACC-DRG

-
                                   HON. AVERN COHN

VAN BUREN PUBLIC SCHOOLS, *South*
*Middle School Principal*, KAREN MIDA,
ROBERT WILKINSON, *South Middle*
*Superintendent*, MICHAEL VAN TASSEL,
VAN BUREN BOARD OF EDUCATION, *Board*
*Members*, BRENT MIKULSKI, MARTHA TOTH,
SHERRY FRAZIER, KEVIN ENGLISH,
KATHY KOVACH, SCOTT RUSSELL,
KELLY OWEN, *Individually*,

SUMMIT ACADEMY NORTH DISTRICT,
*Superintendent*, ALISON CANCILLIARI, *Principal*,
ALEX CHAPMAN; *Assistant Principal*, RIA COLE,
*Special Services Director*, CATHERINE GRIFFIN;
SUMMIT ACADEMY BOARD OF DIRECTORS,
*Board Members*

WYANDOTTE PUBLIC SCHOOLS,
*Superintendent*, DR. CARLA HARDING, *Social Worker*,
MARIA SUTKA, *Psychologist*, DR. VIKTOR BROWN;
*Wilson Middle School Principal*, JASON KRAJEWSKI,
WYANDOTTE BOARD OF EDUCATION,
*Board Members*, ROBERT KIRBY, CHRISTOPHER
CALVIN, PATRICK SUTKA, STEPHANIE MIELLO,
*Trustees*, KATHRYN BEDIKIAN, DANA BROWNING,
MICHAEL SWIECKI, *Individually*.

DEARBORN HEIGHTS PUBLIC SCHOOLS, JEFFREY
L. BARTOLD, Superintendent, JON ZNAMEROWSKI,
*OW Best Middle School Principal*, CLAUDIA PORTSCHELLER,
*OW Best Middle School Vice Principal*.

       Defendants.

1

_____/
THE RASOR LAW FIRM, PLLC
James B. Rasor (P43476)
Jonathan Marko (P72450)
Attorney for Plaintiffs
201 E. Fourth Street
Royal Oak, Michigan 48067
(248) 543-9000; (248) 543-9050 fax
jbr@rasorlawfirm.com
jrm@rasorlawfirm.com
_____/

**FIRST AMENDED COMPLAINT AND RELIEANCE ON JURY DEMAND**

**NOW COMES** the above named Plaintiff, by and through her attorneys, The Rasor Law Firm, and for her First Amended Complaint against the above-named Defendants, states as follows:

**INTRODUCTION**

1.      This is an action for money damages brought pursuant to Title IX of the Education Amendments of 1972 and Title IV of the Civil Rights Act of 1964, Title VII, the Michigan Elliott Larsen Civil Rights Act and under the statutes and common law of the State of Michigan.

2.      This lawsuit arises out of events occurring within the Cities of Wyandotte, Dearborn Heights, Van Buren, and Romulus, County of Wayne, State of Michigan.

3.      Jurisdiction is based upon Title IX of the Education Amendments of 1972, 42 U.S.C. 1681 (Title IX) and its implementing regulations and Title IV of the Civil Rights Act of 1964, 42 U.S.C. 2000c et seq. (Title IV). The amount in controversy in this case is well in excess of this Court's jurisdictional minimum.

## PARTIES

4.      Plaintiff, Kimberly Tooley as Next Friend of Seth Tooley, is a resident of the City of Dearborn Heights, County of Wayne, State of Michigan.

5.      Defendants, South Middle School and its administrators: Karen Mida, South Middle School Principal; Robert Wilkinson, Interim Principal of South Middle School; Michael Van Tassel, Interim Principal of South Middle School are organized and existing under the laws of the State of Michigan, with their principal place of business in the City of Van Buren, County of Wayne, State of Michigan.

6. Defendants, Summit Academy Charter Public School and its administrators: Amy Grey; Ms. Clark; Mr. Alex Chapman, Principal; Ria Cole, Superintendent; Catherine Griffin; Robin Paris; Ms. Nelson are organized and existing under the laws of the State of Michigan, with their principal place of business in the City of Romulus, County of Wayne, State of Michigan.

7. Defendants, Wilson Middle School and its administrators: Maria Sutka, Dr. Brown, Psychologist; Ms. Alt; Mr. Krease; Cindy Hough; Dr. Carla Harding, Superintendent; Jason Krajewski are organized and existing under the laws of the State of Michigan, with their principal place of business in the City of Wyandotte, County of Wayne, State of Michigan.

8. Defendants, O.W. Best Middle School and its administrators: Jon Znamerowski, Principal and Claudia Portscheller, Vice Principal are organized and existing under the laws of the State of Michigan, with their principal place of business in the City of Dearborn Heights, County of Wayne, State of Michigan.

## COMMON FACTUAL ALLEGATIONS

1. Plaintiff is a 14 year old boy. He was born as a girl, named Olivia, but has since transitioned, and now goes by Seth Tooley. He has experienced overwhelming instances of harassment and discrimination because of his transition, as outline below.

2. Plaintiff, Seth Tooley began sixth grade at South Middle School in Van Buren, Michigan on September 6, 2011.  Approximately a week later, Plaintiff was passed a note during class to him by a classmate, Katana Vaughn.  He waited until he returned home to open it.  The letter told him he was going to go to hell because of the way he dressed and there was a rainbow colored on it.

3. The next morning, Plaintiff's mother called Karen Mida, the vice principal at South Middle School in Van Buren, Michigan.  Mrs. Mida knew Seth and plaintiff's mother for years, as she was the principal at South Elementary School and was aware of who Seth was, and of Seth's transitioning.  Plaintiff's mother brought her the note and she made light of it, saying that Katana comes from a good family.  Ms. Mida made a copy of the note.  She said it was for Seth's file and kept the original note and said she would take care of it, but never did.

4. That same day Seth got off the bus and ran through the door upset.  He had urinated himself because he was scolded for attempting to walk into the boy's bathroom, so he just didn't go all day long.

5. Also that same day, Plaintiff was given another note from the same little girl that told him he was going to go to hell the day prior.  Inside it, she asked him to forgive her for scaring him.  Plaintiff's mother went to South Middle School the next morning and told Mrs. Mida what had happened. Mrs. Mida told Plaintiff's mother that she figured that

since the girl apologized on her own, that the situation was handled.  Plaintiff's mother
demanded to have a meeting with the child's parents but Mrs. Mida said it wasn't
possible, but that she would talk to the little girl's mother.

6.  Plaintiff's mother tried for two days to find out what happened with the conversation with
Katana Vaughn's mother. When plaintiff's mother finally caught up with Mrs. Mida, she
said "Oh her mother said that they are good Christian people and Katana would never do
that."  Plaintiff's mother told Mrs. Mida that was not acceptable and reminded her that
she had seen the note Katana had written and that the child needed to be disciplined, but
nothing was ever done.

7.  Plaintiff was forced to take gym and the school said that the only way he could opt out
was if he had a physical handicap.  For days he would change in the bathroom because he
wouldn't change with the girls.  He changed in the stalls but there were cracks and the
same girls stood directly outside his stall when he would change.

8.  Seth's gym teachers yelled at him for being late to class because he took longer to go to
the girl's bathroom to change.  Eventually he went to the bathroom because the girls
wouldn't stop hanging outside the stalls.

9.  Plaintiff's mother went in and spoke with both of the gym teachers but they refused to
take action.

10. Plaintiff's mother requested that Ms. Mida remove Plaintiff from gym class, but was told
that people have to do things in life that they don't want to do.  Plaintiff started to throw
up daily after gym at that point because of the severe harassment.

11. Between September 6 and October 17, 2011, Plaintiff was called fag, queer, and he/she at
school.

12. Plaintiff's mother went to the office almost daily.

13. Four female students told Plaintiff that they kill dykes like him. Plaintiff turned and ran to his locker and while doing so, the girls said, "You better be afraid bitch," and laughed.

14. Plaintiff's mother saw Mrs. Mida about this threat.  Plaintiff didn't know the names of the girls, but he knew their faces. Plaintiff's mother suggested having Seth look at the yearbook from the prior school year to pick out who did this to him when he came to school the next day.  Mrs. Mida agreed to walk Seth to his classes the next day.

15. Mrs. Mida walked Plaintiff to his very first class, but abandoned him after that.  On this particular day, Plaintiff's mother walked in Mrs. Mida's office expecting Seth to pick the girls' pictures out, but she had an excuse that she was going to walk Seth to class and that they would take care of it after first hour when she picked him up.  That never happened.

16. When plaintiff's mother picked him up from school Plaintiff was sick and anxious.  The same girls followed him to gym.   When Plaintiff's mother asked Mrs. Mida what happened, she said she forgot to walk him to the rest of his classes.   Plaintiff and Plaintiff's mother went into Mrs. Mida's office and she told Seth that "When you get older you'll forget all about the kids that didn't like that you were a tomboy and you will develop into a beautiful woman and…"  Seth stood up and said "I am a boy" before plaintiff's mother had the chance to.  Plaintiff's mother again reminded her that those four girls threatened to kill her son.  Mrs. Mida said, "It was their word against hers," and she refused to do protect Plaintiff.

17. Mrs. Mida was unavailable from that point on.  Plaintiff's mother eventually demanded to see Mr. Wilkinson, an interim principal at South Middle School.  Plaintiff's mother made several appointments to see him.  At every appointment he would say the same

things such as, "If she is going to dress like a boy she needs to toughen up." He said "It was Olivia's words against four girls." Mr. Wilkinson said that "The school would be better off without a troublemaker like her."

18. On or about November 1, 2011 a meeting was held with Mr. Wilkinson according to a certified letter he sent Plaintiff's mother. In this letter, Mr. Wilkinson threatened Plaintiff's mother with truancy charges. At that point, Mr. Wilkinson had threatened Plaintiff's mother with CPS several times.

19. Seth never returned to school after October 17, 2011 because Mrs. Mida failed to discipline Katana Vaughn and the four girls that threatened to kill him. The administration at South Middle School said Seth needed to make the changes by dressing more feminine and that he wasn't allowed to use the boy's restroom.

20. Plaintiff's mother made an appointment to see Superintendent Mr. Van Tassel on three separate occasions. She also left him several voice mails. She even walked in two times demanding to see him. She explained that her child had been out of school for a very long time and that she needed help so that her child could get back in school, but she never received a reply.

21. In January 2012, Plaintiff's mother decided to look into different school options because of the harassment. Plaintiff's mother chose Summit Academy- Romulus campus.

22. After Seth was tested, the special education department at Summit advised Plaintiff's mother that Seth needed to go down a grade. Plaintiff's mother had a meeting with the principal and special education teacher and advised them of Seth's transitioning. They said that there wouldn't be a problem; however, they refused to call him by his name, Seth, or even an alternative nickname.

23. The staff and everyone involved at Summit Academy informed Plaintiff's mother that they would "Not participate in any correspondence be it verbal or oral where Plaintiff's mother did not support Olivia in her emotional and mental potential or it would be to her and [my] detriment."

24. When Plaintiff left South Middle School he started to experience a psychosomatic pain condition and within a few months he was in a wheelchair. This was caused by the mental and emotional distress that had taken its physical toll on the Plaintiff as a result of Defendants' actions.

25. In February 2012, Seth started to miss a lot of school. This was due to the psychosomatic pain and vomiting from being bullying by staff and students. Plaintiff's mother then asked about homebound school.

26. On or about February 16, 2012 Plaintiff's mother spoke with Amy Gray from special education over the phone and requested that Plaintiff's mother "Fax over the diagnosis of dystonia to her and she could get the ball rolling on the homebound instruction." Seth was seeing his new neurologist Dr. Sivaswami at that time. Plaintiff's mother faxed the report to Summit Academy, attention Amy Gray on February 23, 2012. On it, plaintiff's mother made a note that the hard copy would be brought into school. The same day Plaintiff's mother faxed the report, emailed the school and asked them if they had a wheelchair they could borrow until insurance paid for one. When Plaintiff's mother talked to them about this at a later date, Mrs. Clark the fifth grade teacher, Mr. Alex Chapman the principal, and Ria Cole the superintendent, refused to provide Seth with accommodations.

27. Plaintiff's mother hand-delivered the information to Mrs. Clark herself.   Jan, the secretary at Dr. Frederelli's office faxed the homebound paperwork several times because they kept saying that they never received it.   There were fax confirmations from the doctor's office that Jan sent the documents dated March 15, 2012.

28. On March 28, 2012 Plaintiff's mother received an Email from Kathryn Griffin, the special education director.   The email said that she acknowledged receiving documentation on March 28, 2012, when the fax confirmations actually said she received it on March 15.   After receiving it, they had 15 days to have an Individualized Education Plan (IEP).   Ms. Griffin said that she "has someone in mind for a teacher, but it wasn't exactly positive. She wasn't sure that was going to work."   The potential teacher was in the process of registering for school and had to check her schedule at that time. They were not adhering to mandatory deadlines and were not taking this seriously.

29. Also, the same day Kathryn Griffin asked Plaintiff's mother for any paperwork that she may have from the old school that may help out. Van Buren had already sent over Seth's file at that point. She clearly had not reviewed or looked at it when it was sent. Plaintiff's mother had to contact RESA and they intervened.   An RESA representative called Summit and told them they only had a certain amount of days to get Seth into school.

30. On April 17, 2012, Homebound IEP was finally held, which was beyond 30 days after it was faxed from the doctor's office.

31. During the IEP, they discussed who the teacher would be.  Ms. Clark was the fifth grade teacher and she agreed to do it but she would only do it Tuesdays and Thursdays because of her school schedule and "Fridays were her date nights with her husband."  They also talked about the fact that Seth was transitioning and that Plaintiff's mother wanted him to

be referred to as Seth.  Ms. Clark refused to do so.  Plaintiff's mother stated that she felt that their lack of cooperation and understanding was where Seth's depression and a lot of the other issues were coming from.

32. Ms. Griffin said that Plaintiff's mother was free to hire her own teacher if she would like to.

33. Ms. Clark stated she would not call a child that is clearly a female by a male name and that it was "not appropriate to make her feel that way."  Ms. Clark had never even met Seth.  Seth lived as a boy and Plaintiff's mother tried to explain that.  Plaintiff's mother explained that her son has been known as Seth the whole time but no one would allow it, but Ms. Griffin she said that it was too late now.  Plaintiff's mother was left again with no choice.  The staff, administration and teachers all again reiterated that any and all correspondence had to be of Plaintiff as Olivia.

34. On or about August 30, 2012, Plaintiff's mother went to meet-your-teacher night at Summit.  Plaintiff's mother talked to Seth's teacher Robin Pierce about Seth being transgender.  She also brought some information for her to read explaining transgender people and the transitioning process, including the importance of Seth being referred to in masculine terms.  Ms. Pierce said she would get back to Plaintiff's mother, but eventually said she said was not allowed to refer to Seth in masculine terms.

35. On or about September 14, 2012 was picture day.  Seth's picture was zoomed in on his face, so none of his wheelchair showed in the picture.

36. Plaintiff's mother requested to amend the IEP based on Seth's problems he was having in his class, but was denied the right.  Approximately one week prior to October 3, 2012, Plaintiff's mother went into class and asked Ms. Pierce why several of Seth's papers were being marked down or marked as incomplete.  Plaintiff's mother told her a few times that

Plaintiff had trouble with his penmanship and because his hands hurt and spasmed, which caused by his penmanship to change literally from hour to hour. Ms. Pierce ignored Plaintiff's mother and she said she needed to leave.  Plaintiff's mother and Ms. Pierce had another interaction over the same subject matter that same week and Ms. Pierce informed Plaintiff's mother that she was only legally required to stick to the IEP, so Plaintiff's mother made an appointment to amend it.

37. The meeting to amend the IEP was scheduled for October 3, 2012. Everyone showed up including the principal, Mr. Chapman. The school refused to amend the IEP.

38. Plaintiff's mother brought in the diagnosis of dystonia and samples of how beautifully Seth used to write; Plaintiff's mother showed how Seth's penmanship had deteriorated over the last few years and that Plaintiff's mother wanted the IEP to be amended.

39. Ms. Pierce refused to accept entire papers due to Seth's penmanship problems.  Plaintiff's mother told her that if Seth is anxious or nervous he gets spasms and he experienced them in his hands too.  Sometimes his hands were fine but other times they weren't.  Ms. Pierce stopped Plaintiff's mother and said "who are you talking about?" with a smirk. "Are we talking about the same person?"  As though to mock that they were talking about Olivia as a boy.

40. Ms. Pierce said "do you mean to tell me that since Olivia has triple the time to finish her work when she misses a day of school, which is the longest of any child I've ever had, she doesn't have any amount of time that she doesn't have an episode?"

41. Mr. Chapman stopped the entire meeting and said that they were not amending an IEP for this.  Ms. Grace said, "We need some diagnosis to continue to give services to her, she

doesn't seem to have all these things wrong that you say she has wrong."  Plaintiff's mother wasn't the one who diagnosed him. His doctors had.

42. Mr. Chapman told Plaintiff's mother that he thinks she likes the attention and Olivia has suffered for it.  Plaintiff's mother said that these were grades and Seth has a handicap that isn't being taking into consideration when giving those grades and that they were making it worse and causing more anxiety.  Mr. Chapman said he wasn't doing it.  He stood up and said "Have a nice day Ms. Tooley."

43. On or about October 4, 2012, Plaintiff's mother emailed Seth's doctor and asked for all the diagnoses that they had on record, so she could keep getting him services at Summit while she decided whether or not she was going to take him out.  Seth was very unhappy there but he was afraid to go to a regular public school.  He liked that at Summit he wore a uniform.  In a uniform, he didn't stick out and he could disappear into the crowd.

44. Summit called CPS stating that Plaintiff's mother had Munchhausen syndrome. CPS concluded that the complaint was unfounded.

45. Plaintiff's mother then took Plaintiff out of Summit.

46. On or about December 4, 2012, Plaintiff started sixth grade at Wilson Middle School.

47. On or about January 14, 2013, Plaintiff's mother turned in her part of the evaluation paperwork to enroll Seth, and followed up via email.  Plaintiff's mother spoke with Dr. Brown, the school psychologist, that week regarding Seth being transgender.

48. Plaintiff's mother also spoke with Maria Sutka about Seth needing to be referred to as Seth and about having access to the boy's bathroom. Plaintiff's mother was told that it was in Olivia's best interests to be referred to as Olivia and to use female pronouns, even though he had been living as a male for years.

49. Plaintiff's mother let the teachers and administration know that she wasn't going to allow this.  That all of Seth's doctors and psychologists stated that the fact that his gender identity had been denied for so many years, was causing his psychosomatic pain.

50. It wasn't until a month after Maria Sutka, the social worker, spoke with his therapist that she agreed to allow Seth to be referred to as such, but they still made Seth use the staff ladies room across from the cafeteria.

51. When Plaintiff's mother complained enough, they told Seth about another bathroom.  The bathroom was unisex, but they didn't tell him about the bathroom until they were doing construction on the front office. By that time the unisex bathroom was closed most of the time.

52. Seth was warned to never try to use the boy's bathroom upstairs.  It was a trough urinal and there were no doors.  He was told that if boys caught him sneaking, they would see him and he would probably get hurt.  Maria Sutka said to Seth, "who would be there for your sister if someone hurts you?"

53. On or about May 28, 2013, Plaintiff's mother emailed the social worker, Maria Sutka, requesting the principal's email address so she could make yet another unsuccessful attempt at an appointment with him.

54. Ms. Alt, Seth's math teacher, made a hurtful comment about Seth.  Seth had missed a week of school and when he came back, Ms. Alt asked the co-teacher, Mr. Crease, if Seth was there?  Plaintiff kindly said yes.  Mr. Crease was standing next to Seth working with him and she said "Wow that's a surprise."  Seth fought tears as hard as he could and the kids laughed at him.  He then asked to go to the bathroom, but Ms. Alt denied him permission, so he stayed there with everyone staring at him.

55. The next week, Ms. Alt called Plaintiff Olivia three times in roll call.  Plaintiff's mother finally met with Ms. Alt.  Ms. Alt refused to see Plaintiff's mother at first, but finally met with Plaintiff's mother and said she would make a conscious effort to stop calling Plaintiff Olivia.  Ms. Alt placed the blame on Plaintiff's mother saying that if she wanted the name to be different, she should change it legally.  During the meeting Ms. Alt told Plaintiff and Plaintiff's mother that her sister had a type of arthritis, so she understood Seth's pain.  Ms. Alt told Seth that he needed to work through his pain and not let it own him.  Plaintiff's mother asked Ms. Alt about Seth's IEP and the math disability and how the school could help him succeed. Ms. Alt said that Plaintiff needed to stop missing school or he will not succeed, right in front of him.

56. On or about June 17, 2013, Cindy Hough, special education director at Wilson Middle School outed Seth to another student's mother during her son's IEP.  Marcy Mayrand, a neighbor and the mother of a boy that Seth played with, called Plaintiff's mother telling her that Ms. Hough just stepped out of her son's IEP to make copies and that Ms. Hough mentioned Olivia Tooley. Ms. Hough asked Marcy Mayrand if she knew that her son's friend, who he has been playing with all summer, is a girl?  Marcy was bragging to Mrs. Hough about how well her son Sean's behavior had been since he had found a friend in Seth.  Marcy felt Seth was a good influence on her son.  Plaintiff's mother drove to the meeting and went to see Mrs. Hough.  When Plaintiff's mother arrived, Marcy recorded the conversation.  Ms. Hough basically made excuses as to why she outed the Plaintiff.

57. After the meeting, Plaintiff's mother requested, seven times in writing, to receive a meeting with Dr. Carla Harding, the superintendent, and Mr. Krajewski the principal.

14

Plaintiff's mother called and left voicemails and also went into the Principal's office twice.   Mr. Krajewski just refused to speak with Plaintiff's mother.

58. On or about June 26, 2013, Seth's schoolmate, who worked with his older brother at the concession stand at Bishop Park, called Seth a "fucking faggot" and refused to sell him and a friend water.  Plaintiff's mother filed a formal complaint with the head of parks and recreation about what happened, but nothing was done.  They told Plaintiff's mother to have her son stay away from their concession stand because of their religious rights.

59. The younger boy who was at the concession stand was from Seth's school and told Plaintiff's mother that their principal had told him that Seth was a girl. The next day, Plaintiff's mother emailed Maria Sutka and told her she needed to know where and when she could get into contact with Mr. Jason Krajewski.  Plaintiff's mother told Maria Sutka what happened at the park and that several other students told her that Mr. Krajewski outed Seth.  Plaintiff's mother also found out that a classmate's mother refused to let her kids play with Seth after Mr. Krajewski told her that Seth was in fact a female.

60. On or about July 15, 2013 was Nate Adkins first attack of Seth.  Nate Adkins was a boy that Seth went to school with.  He was an eighth grader at Wilson Middle School in Wyandotte.  Chris Sizemore was another boy in Seth's seventh hour language arts class that Seth had problems with.

61. Because Seth wasn't allowed to use the regular boy's bathroom, he was forced to use the women's staff restroom which was clearly marked as such. This bathroom was right outside the cafeteria. Nate saw Seth come out of the bathroom one afternoon, laughed at him and asked, "Do you need a tampon sweetie?"  Then laughed and called him a fag

while walking away.  Seth told his mother about this and she immediately made an appointment with Ms. Sutka, but it was dismissed as Seth being overly sensitive.

62. On or about July 15, 2013, Seth was at Pulaski Park with a friend and a few smaller boys all talking about their bikes, when out of the blue, Seth looked up because he recognized one of the voices.  It was Nate Adkins.  Nate walked up behind him and pushed Seth's neighborhood friend off his bike, got in Seth's face, laughed and said, "You better run fag.  Are you scared?  I'll rape you straight."  Seth ran away so hard he was injured.  Seth fractured his elbow and he hit his ear and his face.  That child was eventually prosecuted.

63. Early September 2013, Seth started at a new school, OW Best Middle School in Dearborn Heights.

64. Seth was basically accepted by staff but was not allowed to use the boy's bathroom.

65. Mr. Zemerowski made comments every day at lunch when Seth was sitting with his female friends.  Mr. Zemerowski would come up behind Seth, pat him on the back, and say "Have a nice day ladies."  Plaintiff's mother let Mr. Zemerowski know several times that it bothered Plaintiff, but he still did it.  Mr. Zemerowski told Plaintiff's mother many times that it would have been a lot easier if Seth was just honest with everyone.

66. On or about November 11, 2013, Vice Principal, Ms. Portescheler saw Seth and his girlfriend hold hands in the hallway.  It was Plaintiff's first girlfriend and he didn't know he couldn't hold hands with his girlfirend.  When the vice principal saw it, she went up to Seth and his girlfriend and told them to stop now or they would both be in detention.

67. When Plaintiff's mother picked up Seth from school he told his mother what happened.  He was embarrassed, but Plaintiff's mother told him it was okay and they moved on with

their Friday evening.  Around dinnertime, Seth received a text from his girlfriend that she wanted to call him when he was done eating.

68. Seth's girlfriend said that Mrs. Portercheler had called and told her mother what happened at school and that her mom was making her break up with the Plaintiff.  Then Seth's girlfriend said "Are you a girl?  She told my mom you're a girl.  Are you a girl? Tell me the truth."

69. Mrs. Portescheller outed Seth to his girlfriend's parents.

70. Seth experienced kidney infections due to not being allowed to use the bathroom.  He was in the hospital at Children's on or about April 1, 2014.

71. Plaintiff's mother called an IEP around April 2014 because Plaintiff had a math disability, but when he asked for help, they told him that he needed to stop missing so much school.

### COUNT I:

### VIOLATIONS OF 42 U.S.C. § 1983 et. seq.

72. Plaintiff realleges as though fully set forth herein and incorporates by reference the factual allegations set forth in paragraphs 1 through 72 of this Complaint.

73. Defendants have a custom, policy or procedure of discriminating against students on the basis of sex, specifically transgender individuals. This custom, policy, or procedure allows their employees and agents to violate the constitutional rights of students, like Plaintiff.

74.  In addition, Defendants have also been given notice on repeated occasions of a pattern of ongoing constitutional violations and practices against students by Defendants and the

agents under their supervision. Said patterns and practices have resulted in, and continue to result in the wrongful injury to transgender students, particularly to Plaintiff.

75. Despite notice, Defendants have demonstrated deliberate indifference to these patterns and practices of constitutional violations by failing to take necessary, appropriate, or adequate measures to prevent their continued perpetration. This lack of adequate response by Defendants demonstrates the existence of a custom or policy by Defendants that tolerates and promotes the continued violation of civil rights of American citizens by Defendants and others under Defendants' supervision.

76. By committing the acts complained of herein, Defendants, while acting under color of law, have demonstrated a deliberate indifference to clearly established law.

77. Defendants and persons acting under color of state law and as agents of, and/or in collusion with, Defendant School Districts, caused a constitutional deprivation of Plaintiff's rights, namely the loss of Equal Protection under the law and a loss of Substantive Due Process under the law.

78. In doing the acts complained of herein, Defendant violated Plaintiff's Fourteenth Amendment substantive due process right by arbitrarily depriving Plaintiff and other transgender individuals of protected interests.

79. Defendants' willful, wanton and malicious denial of necessary and appropriate medical treatment to Plaintiff, while acting under color of law, denied Plaintiff his right to Substantive Due Process and his right to Equal Protection under the Fourteenth Amendment to the United States Constitution.

80. Defendants also violated Plaintiff's Fourteenth Amendment Substantive Due Process right by failing to train educators to handle and understand the needs of transgender individuals.

81. Defendants further violated 42 U.S.C. section 1983 by failing to provide equal access to educational opportunity to Plaintiff as they did to Plaintiff's peers.

82. The intentional, willful and wanton act of Defendants establishes a claim for punitive damages by Plaintiff against non-governmental Defendants.

83. As a direct and proximate result of the unconstitutional policies and acts of Defendants, Plaintiff sustained physical injury, pain and suffering in violation of 42 U.S.C. section 1983.

WHEREFORE, Plaintiff prays for judgment against Defendants, as set forth above.


### COUNT II:

### SEX/GENDER DISCRIMINATION UNDER TITLE IX

### 20 U.S.C. sections 1681 et. seq.

84. Plaintiff realleges as though fully set forth herein and incorporates by reference the factual allegations set forth in paragraphs 1 through 84 of this Complaint.

85. Title IX of the Education Amendments of 1972 provides in relevant part:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ....
20 U.S.C. § 1681(a).

86. The public and charter school funding is a program or activity within the meaning of 20 U.S.C. § 1681(a).

87. The acts complained of herein constitute a violation of Plaintiff's statutory rights under 20 U.S.C. §1681 et. seq. by effectively denying the benefits to transsexual individuals on the basis of their sex, and by failing to accord transsexual individuals equal treatment and benefits.

88. Defendants' acts in denying Plaintiff adequate accommodations in an educational environment were done with deliberate indifference to Plaintiff's health and well-being.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth under Title IX.


## COUNT III:

## SEX-BASED HARASSMENT UNDER TITLE IV of the CIVIL RIGHTS ACT OF 1964

## 42  U.S.C. §§ 2000c-2000c-9

89. Plaintiff realleges as though fully set forth herein and incorporates by reference the factual allegations set forth in paragraphs 1 through 89 of this Complaint.

90. Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c-6, prohibits discrimination on the basis of, among other things, race, color, and/or national origin in public schools, which deprives individuals of the equal protection of the laws. Actual knowledge of and a clearly unreasonable response to severe or pervasive harassment, which bars students from enjoying the educational benefits afforded to them based on race, sex, gender, color, and/or national origin, constitutes discrimination.

91. Defendants' deliberate indifference to known instances of severe and pervasive harassment to which a transgender student was subjected as alleged in paragraphs 1-47, effectively barred him equal access to educational opportunities. Defendants' acts and omissions as alleged in paragraphs 1-72, deny transgender students the equal protection

of the laws in violation of the Fourteenth Amendment to the Constitution of the United States.

WHEREFORE, Plaintiff prays for judgment against Defendants, as set forth above.

## COUNT IV

## VIOLATION OF MICHIGAN ELLIOTT LARSEN CIVIL RIGHTS ACT

68. At all material times, Plaintiff was an student, and defendants were public institutions, covered by and within the meaning of Michigan Elliott Larsen Civil Rights Act, MCL 37.2101, *et seq*.

69. Plaintiff's sex was at least one factor that made a difference in defendants' treatment of him.

70. Defendants, through their agents, representatives, and employees, were predisposed to discriminate on the basis of sex and acted in accordance with that predisposition.

71. Defendant treated Plaintiff differently from similarly situated male students in the terms and conditions of his education, based on unlawful consideration of sex.

72. Defendants' actions were intentional and disregarded for Plaintiff's rights and sensibilities.

73. Defendants retaliated against Plaintiff for complaining about the unlawful treatment that he was experiencing, in violation of the Elliott Larsen Civil Rights Act.

74. As a direct result of defendant's unlawful actions Plaintiff has sustained and continues to sustain injuries and damages.

WHEREFORE, Plaintiff prays for judgment against Defendants, as set forth above.

## COUNT V

## VIOLATION OF THE 14TH AMENDMENT

75. Plaintiff hereby incorporates by reference the foregoing paragraphs as if fully restated herein.

76. Defendants are liable to the Plaintiffs for violation of the equal protection rights of Seth Tooley guaranteed by the Equal Protection Clause of the 14th Amendment, by failing to take decisive and appropriate remedial measures against known perpetrators of the offensive harassment, said failure being deliberate and intentional.

77.     Plaintiff was not provided access to the educational programs of the Defendants as other similarly situated students were.

78.     Defendants failed to ameliorate the disparity between Seth Tooley and the rest of the student body and staff in that they did not reprimand or punish any individual who harassed, bullied, or otherwise discriminated against Seth Tooley to the extent that it affected his educational opportunities.

79.     Defendant's failure to provide an equal educational opportunity as mandated by Federal law is a violation of the Equal Protection clause of the 14th Amendment.

        **WHEREFORE,** Plaintiff requests this court enter judgment against Defendants in whatever amount she may be found to be entitled, together with interest, costs, reasonable attorney fees, and such other relief as this court deems just under the circumstances.

## COUNT VI

## FIRST AMENDMENT RIGHTS

80. Plaintiff hereby incorporates by reference the foregoing paragraphs as if fully restated herein.

81.     Plaintiff Seth Tooley was openly transgender and held himself out as such to his family, peers, work colleagues, teachers, administrators, and the public at large.

82.     Plaintiff Seth Tooley was also a vocal supporter of his own status and the legal rights of transgender people.

83.     Plaintiff Seth Tooley is ensured his right to Free Speech and expressive conduct as demonstrated in his journals and conversations with peers and friends by the First Amendment.

84.     Plaintiff Seth Tooley was retaliated against by his peers for being openly homosexual and expressing himself in manners protected by the First Amendment.

85.     Defendant's failure to punish or protect the harassing students and staff or Seth Tooley, respectively, is a violation of Plaintiff Tooley's right to free speech as under the United States Constitution.

**WHERFORE,** Plaintiff requests this court enter judgment against Defendants in whatever amount she may be found to be entitled, together with interest, costs, reasonable attorney fees, and such other relief as this court deems just under the circumstances.

## <u>COUNT VII</u>

### VIOLATION OF EQUAL PROTECTION RIGHTS UNDER THE MICHIGAN CONSTITUTION

86. Plaintiff hereby incorporates by reference the foregoing paragraphs as if fully restated herein.

87.     Defendants are liable to the Plaintiffs for violation of the equal protection rights of Seth Tooley, guaranteed by M.C.L.A. Const. Art. 1, § 2, by failing to take decisive and appropriate remedial measures against known perpetrators of the offensive harassment, said failure being deliberate and intentional.

88.     Plaintiff was not provided access to the educational programs of the Defendant as other similarly situated students were.

23

89.     Defendants failed to ameliorate the disparity between Seth Tooley and the rest of the student body and staff in that they did not reprimand or punish any individual who harassed, bullied, or otherwise discriminated against Seth Tooley to the extent that it affected his educational opportunities.

90.     Defendant's failure to provide an equal educational opportunity as mandated by Federal law is a violation of Plaintiff's Equal Protection Rights.

   **WHEREFORE,** Plaintiff requests this court enter judgment against Defendants in whatever amount she may be found to be entitled, together with interest, costs, reasonable attorney fees, and such other relief as this court deems just under the circumstances.

## COUNT VIII

### GROSS NEGLIGENCE

91.     Plaintiff hereby incorporates by reference the foregoing paragraphs as if fully restated herein.

92.     At all times material to Plaintiffs' Complaint, Defendants owed a duty to Plaintiff, and to any student attending to keep students safe, to supervise conduct at the school, and/or to maintain an environment conductive to learning.

93. Defendant's wrongful conduct includes but is not limited to the following:

   a.  Failure to discipline students engaged in harassment of Plaintiff as
       required by their District Code;

   b.  Failure to discipline students engaged in harassment of Plaintiff as
       required by their School Regulations and Rules;

   c.  Failure to take appropriate and proper remedial action to preserve
       a safe environment conductive to learning;

    d.  Failure to protect Plaintiff from pervasive physical and emotional abuse of which they had knowledge;

    e.  Failure to train school staff, teachers, principals and counselors on taking the appropriate actions to protect students and provide an equal opportunity educational environment.

94.    By acting in the manner described above, Defendants breached the above duties and all other applicable duties and thereby was grossly negligent and/or guilty of conduct amounting to intentional willful and/or wanton misconduct.  Defendant's actions were reckless and demonstrated a substantial lack of concern as to whether injury or death resulted, thereby subjecting Defendant to liability under Michigan statutes and law.

**WHERFORE,** Plaintiff requests this court enter judgment against Defendants in whatever amount she may be found to be entitled, together with interest, costs, reasonable attorney fees, and such other relief as this court deems just under the circumstances.\

## COUNT IX

## 42 USC 1983 VIOLATION PURSUANT TO *MONELL*

95. The Plaintiff suffered injuries as a result of execution of the Districts' policies and customs, pursuant to *Monell v Department of Soc Servs*, 436 US 658, 690 (1978).

96. Plaintiff's constitutional deprivations resulted from the Districts' customs and procedures.

97. The Districts' failure to train employees, staff, and administration, gives rise to the Districts' liability resulting from the Districts' employee-caused constitutional violations.

**WHERFORE,** Plaintiff requests this court enter judgment against Defendants in whatever amount she may be found to be entitled, together with interest, costs, reasonable attorney fees, and such other relief as this court deems just under the circumstances.

## COUNT X

## 42 USC 1983- VIOLATION OF CIVIL RIGHTS THROUGH SUPERVISION, CUSTOMS, POLICIES, ACUIESCENCE AND TRAINING

98. Plaintiff incorporates herein all other prior allegations.

99. The Defendant Districts had an obligation to train is administrative staff, teachers, counselors and employees regarding the constitutional rights of citizens under the constitution, including but not limited to that they take action to protect students from harassment and discrimination based on sex.

100.     The Defendant districts had an obligation to supervise its administrative staff, teachers, counselors and employees to insure that the constitutional rights of citizens under the Constitution were not violated, including the right not to be subjected to be free from a deprivation of liberty, property, bodily security and integrity without due process of law, and not to expose a greater risk of danger at the hands of the State.

101.     The Defendant districts failed to comply with the aforementioned obligations and had a custom or policy of acting with deliberate indifference to the violations of the constitutional rights of the State's citizens and had a custom or policy of failing to train and/or failing to supervise school district employees regarding the protection/violation of those constitutional rights and/or failing to discipline employees who violated those constitutional rights.

**WHEREFORE,** Plaintiff requests this court enter judgment against Defendants in whatever amount she may be found to be entitled, together with interest, costs, reasonable attorney fees, and such other relief as this court deems just under the circumstances.

## CLAIMS FOR RELIEF

102.     The Plaintiff realleges and herein incorporates by reference the allegations set forth in paragraphs 1-101 above.

103.     Students in the Districts' schools, including but not limited to the Plaintiff, have been harassed by their peers with derogatory language, threats, and physical assaults because of their nonconformity to gender stereotypes and/or sexually harassed by their peers. Sex-based harassment in the Districts is severe, pervasive, or persistent, and has denied or limited students' abilities to participate in or benefit from the District's educational program.

104.     In some instances, the District should have known of the harassment but failed to investigate, address, and/or stop the harassment. In most instances involving Plaintiff, Plaintiff himself and his mother have reported sex-based harassment to school and District officials. District officials clearly knew of the harassment but the District either took no action or its response was inadequate. The harassment continued and in many instances escalated.

105.      A hostile environment exists in the Districts, and the Districts' existing policies and procedures have contributed to the hostile environment.

106.     The District's failure to appropriately and adequately address sex-based harassment violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Title IV of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000c-

2000c-9, Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, 42 U.S.C. § 1983 et. seq. the First Amendment Right to Free Speech and the Elliott Larsen Civil Rights Act.

107.     Unless enjoined by this court, the District will continue to violate the Plaintiff's state, federal and Constitutional rights. Plaintiff requests injunctive relief from allowing the Districts from continuing their discriminatory policies and procedures.

**WHEREFORE**, Plaintiffs requests a monetary judgment for the actual damages sustained together with statutory fees, reasonable attorney fees, interest, and costs.

                              Respectfully Submitted,

\                             **THE RASOR LAW FIRM**


                              /s/ James B. Rasor
                              _____
                              James B. Rasor (P43476)
                              Jonathan R. Marko (P72450)
                              201 East Fourth St.
                              Royal Oak MI 48067
                              (248) 543-9000; (248) 543-9050 fax
                              jbr@rasorlawfirm.com
Dated: September 15, 2014     jrm@rasorlawfirm.com

## <u>RELIANCE ON DEMAND FOR JURY TRIAL</u>

.

       Plaintiffs, by and through their attorneys, The Rasor Law Firm, hereby rely on its demand for jury trial in the above-captioned matter.

                                Respectfully Submitted,

\                                    **THE RASOR LAW FIRM**


                                  /s/ James B. Rasor

                                  _____
                                  James B. Rasor (P43476)
                                  Jonathan R. Marko (P72450)
                                  201 East Fourth St.
                                  Royal Oak MI 48067
                                  (248) 543-9000; (248) 543-9050 fax
                                  jbr@rasorlawfirm.com
Dated: September 8, 2014           jrm@rasorlawfirm.com